# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01514-COA

**ALAN DAVID RYAN**                                                                  **APPELLANT**

**v.**

**MISSISSIPPI REAL ESTATE COMMISSION**                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/16/2015 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | PAUL E. ROGERS |
| ATTORNEYS FOR APPELLEE: | JOHN L. MAXEY II |
| | WILLIAM HOLCOMB HUSSEY |
| | ELLIOTT VAUN HALLER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| TRIAL COURT DISPOSITION: | AFFIRMED ORDER OF THE MISSISSIPPI REAL ESTATE COMMISSION REVOKING APPELLANT'S LICENSE |
| DISPOSITION: | AFFIRMED - 01/31/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

WILSON, J., FOR THE COURT:

¶1.     Alan David Ryan appeals from an order of the Hinds County Circuit Court, First Judicial District, affirming an order of the Mississippi Real Estate Commission (MREC) revoking his real estate broker's license.  We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Ryan became a licensed real estate broker in Mississippi in 1987.  In 2003, he purchased a home in Woodville and executed a deed of trust on the home in favor of

Concordia Bank & Trust Company. Shortly thereafter, Ryan began renting the home to Nathaniel Myers for $275 per month.

¶3. On or about January 1, 2004, Ryan entered into a handwritten "lease to own" agreement with Myers. The agreement provided that Myers would rent the home for $325 per month and that title to the property would be transferred to Myers by warranty deed once he had made 120 monthly rent payments. The agreement stated that Myers's rent would cover taxes, interest, and insurance on the home. Myers's cousin, Eliza Broadway, signed the agreement on Myers's behalf and as a witness. Broadway signed for Myers because Myers is mentally challenged and cannot read or write. Broadway testified that Ryan told her that she could sign the agreement for Myers and encouraged her to do so because the agreement would enable Myers to purchase the property for only $50 per month more than he was paying in ordinary rent.

¶4. Myers made payments as required by the contract for 120 consecutive months. His payments are documented by copies of receipts in the record. However, at the end of the ten-year lease period, Ryan refused to transfer the property by warranty deed. Broadway testified that Ryan told her that Myers needed to make four more payments before he could obtain title. Broadway made those four additional payments in January, February, March, and April 2014. She testified that she did so because she was concerned that Myers would lose his home. But Ryan still refused to transfer the property to Myers.

¶5. According to Broadway, Ryan then claimed that he still owed $16,000 on his mortgage and refused to transfer the property to Myers unless she first paid him $16,000 and

reimbursed him for another $10,000 in taxes and expenses. Broadway refused to pay Ryan any additional money. In April 2014, Ryan persuaded Broadway to sign a handwritten "amendment" to the January 1, 2004 lease-to-own agreement. This document stated that the original agreement was "void," "no longer in force," "cancelled," and "not . . . binding." The document further stated, "Ryan is no longer bound to [the 2004] agreement[;] he is free and clear of all obligation to that contract." In place of the original lease-to-own agreement, Ryan had Broadway sign a new agreement that entitled Myers to live in the home rent-free for ten years but did not provide for any transfer of title to him. The new agreement stated that Myers would be responsible for utilities (as he always had been), while Ryan would continue to make payments to Concordia and pay taxes and insurance on the home.

¶6.     Ryan maintains that he told Broadway from the outset of their discussions in 2003 that Myers's payments would not be sufficient to pay off the mortgage and that a balloon payment would be due in 2014, which Myers would have to pay in order to obtain title to the property.[1] However, at the hearing before the MREC, Ryan admitted that his claim was inconsistent with the terms of the parties' lease-to-own agreement, which did not mention a mortgage or any additional payment by Myers. Moreover, Broadway denied that Ryan ever mentioned a mortgage or any additional payment until the end of the ten-year lease term.

¶7.     On April 30, 2014, Broadway filed a complaint against Ryan with the MREC. After investigating Broadway's allegations, the MREC filed a formal complaint against Ryan. The

---

[1] On May 14, 2014, Concordia notified Ryan that his loan was in default and that it was exercising its right to accelerate the debt. Ryan was given thirty days to pay the loan balance of $16,286.48 plus attorneys' fees.

complaint alleged that Ryan violated Mississippi Code Annotated section 73-35-21(1), paragraphs (a) and (m) (Rev. 2012),[2] which authorize the MREC to suspend or revoke a broker's license if it finds that the broker made "any substantial misrepresentation in connection with a real estate transaction" or engaged in any other conduct that "constitutes or demonstrates bad faith, incompetency, untrustworthiness, or dishonest, fraudulent or improper dealing." The complaint also alleged that Ryan failed to provide Broadway/Myers with a "Working with a Real Estate Broker" form required by MREC Rule 4.3 (Miss. Admin. Code § 30-1601:4.3).[3]

¶8. On February 10, 2015, the MREC held a hearing on the complaint. Ryan appeared pro se. At the time of the hearing, Myers was still living in the rental property; however, he still had not received a deed to the property. In addition to testifying to the facts set out above, Broadway testified that Myers had been forced to pay for significant repairs to the home, including repairs to the roof and plumbing, because Ryan had failed to make the repairs himself. Ryan claimed that he had lost money by allowing Myers to live in the home for $325 per month. Ryan also testified that he was not sure which disclosure forms he provided to Broadway or Myers, but he was sure "it was the right forms." He claimed that their signed forms had been destroyed in a fire at his office.

¶9. Following the hearing, the MREC entered an order finding that Ryan had violated

---

[2] The Legislature amended section 73-35-21(1) effective July 1, 2016. Paragraph (m) was re-lettered as paragraph (n) and amended; however, the amendment is not relevant to the facts of this case. *See* 2016 Miss. Laws ch. 472, § 4 (S.B. 2725).

[3] The complaint noted that a licensee is not exempt from discipline when selling his own property. MREC Rule 3.1.I (Miss. Admin. Code § 30-1601:3.1.I).

4

paragraphs (a) and (m) of section 73-35-21(1) and MREC Rule 4.3. Based on these violations, the MREC revoked Ryan's broker's license.

¶10. Ryan appealed the MREC's order to the circuit court. *See* Miss. Code Ann. § 73-35-25 (Rev. 2012). In the circuit court, Ryan argued that the MREC's findings that he violated section 73-35-21(1) and MREC Rule 4.3 were not supported by substantial evidence and were arbitrary and capricious. He also argued that the MREC's decision to revoke his license was "too severe of a penalty." On September 16, 2015, the circuit court entered an order finding that the MREC's decision was supported by substantial evidence, was not arbitrary or capricious, and did not violate Ryan's constitutional or statutory rights. Accordingly, the circuit court affirmed. Ryan thereafter filed a timely notice of appeal.

## DISCUSSION

¶11. On appeal, Ryan makes the same basic arguments as in the circuit court: (1) that there was not substantial evidence to support the MREC's finding that he violated section 73-35-21(1)(a); (2) that the MREC's finding that he violated MREC Rule 4.3 was arbitrary or capricious; and (3) that the revocation of his license was "too severe of a penalty." We address these arguments in turn below.

¶12. Judicial review of a decision of the MREC "is limited." *Gussio v. MREC*, 122 So. 3d 783, 786 (¶10) (Miss. Ct. App. 2013). When, as in this case, a professional license is at stake, the MREC bears the burden of proving its case by clear and convincing evidence. *Palmer v. MREC*, 14 So. 3d 67, 71 (¶13) (Miss. Ct. App. 2008). However, the MREC's "decision will not be disturbed on appeal absent a finding that it (1) was not supported by

5

substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the [MREC] to make, or (4) violated some statutory or constitutional right of the complaining party." *McDerment v. MREC*, 748 So. 2d 114, 118 (¶9) (Miss. 1999) (quotation marks, brackets omitted). Further, "great deference [is] afforded [to the MREC's] 'construction of its own rules and regulations and the statutes under which it operates.'" *Id.* (quoting *Miss. State Tax Comm'n v. Mask*, 667 So. 2d 1313, 1314 (Miss. 1995)).

¶13.    As noted above, the MREC is expressly authorized to revoke the license of a broker who has made "any substantial misrepresentation in connection with a real estate transaction" or who has engaged in any other conduct that demonstrates "bad faith, incompetency or untrustworthiness, or dishonest, fraudulent or improper dealing." Miss. Code Ann. § 73-35-21(1)(a) & (m). "In order to take or suspend the license of a real estate broker under a charge of improper dealings, the proof need not be beyond a reasonable doubt, but the testimony must clearly establish the guilt of the respondent." *Palmer*, 14 So. 3d at 71 (¶13) (alterations omitted) (quoting *MREC v. Anding*, 732 So. 2d 192, 197 (¶13) (Miss. 1999)). "Improper is defined as '[n]ot suitable,' 'unfit,' 'not suited to the character, time, and place,' or 'not in accordance with fact, truth, or right procedure.'" *Farris v. MREC*, 994 So. 2d 229, 233 (¶15) (Miss. Ct. App. 2008) (quoting Black's Law Dictionary 757 (6th ed. 1990)). Therefore, a finding that a broker has engaged in "improper dealing" does *not* require evidence of "fraudulent intent." *Id.*

¶14.    There is substantial evidence in the record to support the MREC's findings that Ryan made misrepresentations to Broadway/Myers and engaged in "improper dealing." In 2004,

6

Ryan entered into a lease-to-own agreement under which he clearly agreed to transfer title to the subject property to Myers once Myers made 120 monthly payments of $325. Myers fulfilled his end of the bargain, but Ryan refused to transfer title to the property. Broadway testified that Ryan then promised to convey the property if Myers made four more payments. Myers made those payments, but Ryan again reneged on his promise. Ryan maintains that he and Broadway had an unwritten understanding that Myers would be required to make unspecified additional payments at the end of the ten-year lease term, but the parties' clear written contract makes no mention of such payments, and Broadway denied that additional payments were ever discussed. Broadway's testimony and the documentary evidence before the MREC constitute substantial evidence to support the MREC's findings.

¶15. For the most part, Ryan simply argues that we should accept his testimony at face value and reject Broadway's testimony as not credible. But in a case such as this, "[t]he administrative agency is the trier of facts as well as the judge of the witnesses' credibility." *Nelson v. Miss. State Bd. of Veterinary Med.*, 662 So. 2d 1058, 1062-63 (Miss. 1995). The MREC, as the fact-finder, was entitled to reject Ryan's testimony and find Broadway credible. This is particularly true since Broadway's testimony was consistent with the parties' original contract, whereas Ryan's testimony was not.

¶16. Ryan also argues that "[t]he right to contract is a fundamental right of all citizens under Mississippi law," so the MREC was bound to respect the parties' 2014 agreement that purported to "cancel" and "void" their original (2004) lease-to-own agreement. We disagree. The evidence indicated that Ryan coerced Broadway into signing the 2014 agreement by

7

refusing to honor his obligation under the parties' original agreement. This was yet more "improper dealing" on Ryan's part, not a defense to the charge.

¶17.    Ryan next argues that he cannot be punished for failing to provide Myers/Broadway with a "Working with a Real Estate Broker" disclosure form (MREC Rule 4.3) because MREC Rule 3.2.G (Miss. Admin. Code § 30-1601:3.2.G) only requires a broker to keep such documents for three years. This argument is without merit. The rule states: "A real estate broker must keep on file for three years following its consummation, complete records relating to any real estate transaction." *Id.* The evidence was clear that the relevant real estate transaction was not consummated in 2004 because the parties' agreement provided for a ten-year lease-to-own period. Thus, the MREC hearing was held well within the rule's three-year records retention period. Not only was Ryan unable to produce the required disclosure forms, he was unable to say which forms he provided to Myers/Broadway—only that he was sure "it was the right forms." There was substantial evidence before the MREC that Ryan failed to provide the required disclosure forms.

¶18.    Finally, Ryan argues that revocation of his license was "too severe of a penalty." "The authority of the [MREC] to revoke the license of a broker . . . is a right given to the [MREC] to take from the licensee the right to do business and make a living in the practice of his profession. Such authority should be exercised with caution." *MREC v. Ryan*, 248 So. 2d 790, 793 (Miss. 1971). However, the Mississippi Supreme Court has held that if there is substantial evidence to support a finding of improper dealing by a broker, we are not "to separately second guess [the MREC's] imposition of sanction." *Harris v. MREC*, 500 So.

8

2d 958, 963 (Miss. 1986); *accord Farris*, 994 So. 2d at 235 (¶23).  Under our "traditional standard of review," once we have determined that improper dealing was established by clear and convincing evidence, "we look no further." *Harris*, 500 So. 2d at 963.  In any event, in this case, the MREC's decision to revoke Ryan's license was not arbitrary or capricious.  There was substantial evidence that Ryan willfully refused to honor his clear contractual obligation to convey the property to Myers and then took advantage of the situation to coerce Broadway into signing a new agreement that purported to cancel the original contract.  There was also substantial evidence that Ryan coerced Myers/Broadway into paying an additional $1,300 even though he had no intention of honoring the original contract.  This was sufficient evidence to justify the MREC's decision to revoke Ryan's license.

## CONCLUSION

¶19.  The order of the MREC revoking Ryan's license was supported by substantial evidence and was neither arbitrary nor capricious.  Accordingly, we affirm the judgment of the circuit court affirming the order of the MREC.

¶20.  **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT, IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR.  WESTBROOKS, J., NOT PARTICIPATING.**

9